*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SCOTT J. CHAKMAK,

        Plaintiff-Appellant/Cross-Appellee,

v

ESTATE OF JOAN S. CHAKMAK, by SUZANNE
KOSS and SCOTT SAMBERG, Co-Personal
Representatives,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
June 25, 2020

No. 346477
Oakland Probate Court
LC No. 2017-377067-CZ

Before: TUKEL, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order following a bench trial dismissing his claims against defendant,[1] and defendant cross-appeal that order insofar as the trial court did not rule on defendant's request for sanctions against plaintiff for the filing of frivolous claims. We affirm.

Plaintiff's father, Albert Chakmak (Chakmak), and plaintiff's stepmother, Joan Chakmak (Joan), married around 1981. In 2002, the two executed an "Agreement of Trust" prepared by their estate planning attorney. The Agreement of Trust created "The Albert and Joan Chakmak Trust," for which Chakmak and Joan were both the grantors and trustees. The Agreement of Trust also provided that if Chakmak passed away before Joan, the "Albert and Joan Chakmak Trust" would be split into a "Survivor's Trust," and a "Family Trust," with Joan serving as the sole trustee of the Survivor's Trust, and Joan and plaintiff serving as trustees for the Family Trust. The

---

[1] In the trial court, plaintiff raised claims against his stepmother, Joan S. Chakmak, both individually and in her capacity as a trustee of a trust. The latter passed away during the pendency of this appeal, and therefore this Court entered an order substituting "the 'Estate of Joan S. Chakmak' for Joan and adding " 'Suzanne Koss Personal Representative' and 'Scott Samberg Personal Representative' to the case caption." *Chakmak v Chakmak*, unpublished order of the Court of Appeals entered August 13, 2019 (Docket No. 346477).

Agreement of Trust provided for the division and distribution of the assets and income of The Albert and Joan Chakmak Trust in the event of Chakmak's death. On the same day the Agreement of Trust was signed, Chakmak signed his last will and testament, which named Joan as his personal representative, incorporated by reference a separately executed list of gifts of personal property from his estate, and directed that the residue of his estate be added to the principal of the Trust and held, managed, and distributed in accordance with the terms of the Agreement of Trust.

Chakmak and Joan owned multiple properties in Colorado, including five undeveloped properties titled exclusively to Chakmak. The latter were individually identified as Lots 26, 30, 54, 60, and 144. Chakmak owned a Rolex watch, which plaintiff testified that Chakmak told him throughout his life was going to belong to plaintiff one day, and that Chakmak "reinforced that through [their] relationship up until" he passed away. According to plaintiff, Chakmak also owned an extensive collection of high-quality tools and an associated toolbox, which Chakmak gave him before he passed away.

Chakmak passed away in 2011. According to plaintiff, Joan invited him to take the watch after Chakmak's death, but she later took the watch from plaintiff's home and gave it to another family member. Similarly, plaintiff testified that Joan invited him to take the tools after Chakmak passed away, but that he thought it expedient to leave them at Joan's location where he could use them to fix things. However, according to plaintiff, in time Joan gave some of the tools to another family member and plaintiff did not know what happened to the rest of them.

After Chakmak passed away, his and Joan's estate planning attorney agreed to help Joan with the administration of Chakmak's estate. She explained that The Albert and Joan Chakmak Trust was split into the Survivor's Trust and the Family Trust. According to the estate planning attorney, the couple owned many vacant lots in Colorado. She testified that it was Joan's understanding that all of the properties she and Chakmak owned in Colorado "were in joint tenancy with right of survivorship," and that it was the intention of both Joan and Chakmak that all of the properties be held in such way, but that after Chakmak's death, when Joan tried to sell the properties, it was discovered that five of them were titled in only Chakmak's name. Ultimately, Joan sold four of the lots, lots 26, 30, 54, and 60 in 2011 as part of sale of a 15-lot package, and sold the fifth lot, lot 144, in 2012. Joan did not allocate the proceeds of those sales to either The Survivor's Trust or the Family Trust.

Plaintiff, who was a trustee of the Family Trust, filed a complaint raising numerous claims against Joan, both individually and in her capacity as a trustee of the Family Trust. The trial court dismissed all of plaintiff's claims against Joan individually, and all but two claims against her as a trustee. Ultimately, a bench trial was held on plaintiff's claims that Joan engaged in common law and statutory conversion when she disposed of the Rolex watch and the tools, and that she violated her fiduciary duty as a trustee of the Family Trust when she sold the Colorado properties titled exclusively in Chakmak's name for unreasonable values and then retained the proceeds of those sales. At the close of trial, the trial court found that plaintiff failed to sustain his evidentiary burden, and dismissed plaintiff's claims.

On appeal, plaintiff first argues that the trial court clearly erred when it rejected his evidence regarding the market value of the Colorado properties. We disagree.

This Court reviews a trial court's findings of fact following a bench trial for clear error, and its conclusions of law de novo. *Menhennick Family Trust v Menhennick*, 326 Mich App 504, 509; 927 NW2d 741 (2018). "A finding is clearly erroneous if there is no evidentiary support for the finding or, after reviewing the entire record, this Court is definitely and firmly convinced that the trial court made a mistake." *Id.* "This Court gives 'due regard to the special opportunity of the [trial] court to judge the credibility of the witnesses who appeared before it . . . .' " *Id.* (alteration in original), quoting *In re Clark Estate*, 237 Mich App 387, 395-396; 603 NW2d 290 (1999).

Plaintiff contends that the trial court erred when it disregarded his valuation testimony and instead relied on its own calculations to determine the value of the subject Colorado properties. Plaintiff cites multiple treatises and articles that were not presented or discussed during trial and asks this Court take judicial notice of these treatises and texts. However, "[t]his Court's review is limited to the record developed by the trial court," and a "party is not permitted to enlarge the record on appeal by asserting numerous facts that were not presented at the trial court." *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 579-580; 609 NW2d 593 (2000). See also MCR 7.210(A) ("Appeals to the Court of Appeals are heard on the original record."). While plaintiff asserts that the resources he now relies on are commonly known to be accurate in this jurisdiction, he neither indicates that those resources were unavailable for him to present at trial nor otherwise explains why this Court should consider evidence that was not presented below.

During trial, plaintiff argued that Joan breached her fiduciary duty as a trustee of the Family Trust by misappropriating assets from Chakmak's estate by selling the subject Colorado properties below market value and retaining the proceeds of those sales instead of distributing them to the Survivor's Trust and the Family Trust. Plaintiff testified that he believed that the Colorado properties were not sold at an appropriate price on the basis of his research on comparable property sales in that area that occurred from approximately 2016 to 2018.

Plaintiff, who admitted he was not a licensed realtor or real estate appraiser, testified that he used data from 15 comparable sales to calculate an average price per acre of $48,720, and he explained that he arrived at that figure by using the "average price per lot sold" from a multiple listing service which provided the "acreage price" to him. Notably, even though plaintiff testified that he used data from 15 comparable sales to calculate his average price per acre, plaintiff concedes in a footnote in his brief on appeal that the documentary evidence provided to the trial court included data from only 13 comparable sales. Plaintiff's brief on appeal also contains calculations that provide an average price per acre of $43,519.31, which differs from his trial testimony, but plaintiff asserts that the difference between these figures is not significant for purposes of this case.

According to plaintiff, the comparable sales he used involved a mixture of properties that did and did not have such services as sewer, water, and road plowing; the properties at issue did not have power, wells, or septic systems. He explained that he deducted the "average acreage price" he calculated with a "basically 25 percent discount" to reflect market conditions in 2011 on the basis of data he compiled from the website of the Routt County Assessor's Office regarding the assessed value of the Colorado properties in 2011. Plaintiff also claimed to have "found two additional sources with Zillow that happened to exactly line up" with his valuation. Thus, plaintiff opined that, per his calculations regarding the 2011 market value of an average price per acre, Lot 26 had a value of $47,956, Lot 30 had a value of $38,847, Lot 54 had a value of $40,327, Lot 60

had a value of $44,323, and Lot 144 had a value of $90,464. The trial court rejected his valuation testimony as having insufficient basis and, as part of its analysis, performed its own calculations to show a different possible value.

Plaintiff asserts that the trial court clearly erred when it relied on an improperly calculated average as the basis for its ruling that plaintiff had failed to sustain his burden to show that Joan sold the Colorado properties for an unreasonable price. This argument is inapt because plaintiff effectively underscores the wisdom of the trial court's dissatisfaction with his methodology by presenting in his brief on appeal a price per acre that differs from his trial testimony. More importantly, the trial court did not simply rely on its own calculations, but instead clearly and extensively explained that it found that plaintiff had failed to sustain his burden because of his resort to using unreliable valuation methodology, given that plaintiff failed to provide sufficient explanation regarding his methods, or regarding how he selected his supposedly comparable sales.

In rendering its decision, the trial court noted that there was no explanation in plaintiff's testimony why he did not use comparables from 2011 instead of comparables from 2017 and 2018. The trial court also explained that it had some issues with plaintiff's comparable sales, in that plaintiff had testified that the per acre average price was $48,720 on the basis of the comparable sales plaintiff selected, but there was no information regarding "what sort of development" had been completed in connection with those properties as compared to the subject Colorado properties. The trial court explained that in plaintiff's analysis nothing was done with these properties to bring them into line with the comparables in a way that an appraiser would have done. The trial court thus opined that the property sales on which plaintiff relied were not "shown to be comparable through recognized methods." Only then did the trial court perform its own calculations to ascertain the average price per acre using the comparable sales, and arrived at an average price per acre of $26,764.60 by "adding up" the purchase prices of the comparable sales and dividing that total by the total acreage contained within the comparable sales. The trial court noted the disparity between its calculated price per acre and plaintiff's calculations, but also concluded that even its own calculated price per acre using plaintiff's comparables was generally "not the correct value to use" for valuing any of the Colorado properties. Thus, the trial court conducted its own calculations to illustrate the lack of explanation provided by plaintiff regarding how he reached his valuation, and acknowledged that its own calculated value was not necessarily accurate.

The trial court also found that plaintiff's opinion regarding the value of the Colorado properties was rebutted by the evidence that showed Chakmak had been unable to sell the 15-lot package for substantially lower prices than plaintiff's proposed value. The trial court observed that plaintiff's valuation of $48,720 per acre would have required the 15-lot package to be sold for approximately $643,000, but that the evidence showed that Chakmak was previously unable to sell the 15-lot package. In 2008, Chakmak placed a sales listing for a 15-lot package of Colorado properties, which included lots 26, 30, 54, and 60, for $450,000, and that listing expired in April 2009. In May 2009, Chakmak listed the 15-lot package for $349,000, and that listing expired in May 2010. In August 2010, Chakmak listed the 15-lot package for $249,000. Chakmak passed away in January 2011. In July 2011, a previous listing expired at a reduced price of $149,000. Based on the above, the trial court reasonably found it significant that Chakmak had been unable to sell the properties at issue for many years at a price far less than what plaintiff now asserts their values are. The trial court further explained that the evidence showed that Joan used the same real

estate agent as Chakmak, that she continued with the pricing pattern that was set during Chakmak's lifetime, and that Joan ultimately agreed to a sale price of $103,000 during a conference with Chakmak's and her estate planning attorney and "presumably [Joan's] attorneys in Colorado . . . ."

Additionally, the trial court noted that, even if plaintiff had shown that the Colorado properties at issue had been sold for an unreasonable value, the court's own calculation regarding their value indicated that Joan would have been entitled to retain the proceeds of those sales under certain exemptions and reimbursements to which she was entitled under Michigan law. As a result, plaintiff has failed to show the trial court clearly erred when it determined that plaintiff had failed to sustain his burden in establishing that Joan breached her fiduciary duty in connection with the sale prices of the subject Colorado properties.

Plaintiff also contends that the trial court erred when it determined that plaintiff had failed to sustain his burden to show that Joan sold Lot 144 for just $10. We disagree.

Plaintiff testified during trial that he believed Joan sold Lot 144 for $10 because that was the consideration listed on a personal representative's deed reflecting that sale. The trial court rejected plaintiff's assertion, noting that it the stated $10 in consideration appeared to be a recitation of nominal consideration that was not indicative of an actual sales price. In fact, the trial court explained that it found a copy of the personal representative's deed for the sale of Lot 144 to be inadequate for establishing the actual sale price, and the trial court clearly referenced other documents contained within the record that supported its determination. The trial court explained that other documents, including some of the warranty deeds pertaining to Chakmak's original purchase of Lots 30 and 54, also set forth consideration of $10 where other evidence indicated substantially higher actual purchase prices for those properties.

Plaintiff observes that defendant provided no evidence regarding the sales price of Lot 144, but it was plaintiff who bore the initial burden of production and the persistent burden of persuasion, and the trial court reasonably did not deem sufficient or credible the single piece of evidence plaintiff provided. Further, plaintiff fails to offer any explanation regarding how he was prevented from obtaining or presenting other evidence regarding the sale of Lot 144 that might have corroborated his position that the sale price was a mere $10. Therefore, plaintiff's assertion fails.

Plaintiff next contends that the trial court erred when it ruled that plaintiff's claims of conversion of personal property against Joan failed because Chakmak had not effected completed gifts of the allegedly converted Rolex watch and the tools to plaintiff before Chakmak's death. This argument is without merit.

" '[F]or a gift to be valid, three elements must be satisfied: (1) the donor must possess the intent to transfer title gratuitously to the donee, (2) there must be actual or constructive delivery of the subject matter to the donee, unless it is already in the donee's possession, and (3) the donee must accept the gift.' " *In re Casey Estate*, 306 Mich App 252, 263; 856 NW2d 556 (2014), quoting *Davidson v Bugbee*, 227 Mich App 264, 268; 575 NW2d 574 (1997) (alteration in original). " 'A gift *inter vivos* is not only immediate, but absolute and irrevocable.' " *Casey Estate*, 306 Mich App at 263, quoting *In re Reh's Estate,* 196 Mich 210, 217; 162 NW 978 (1917).

"Delivery must be unconditional and must place the property within the dominion and control of the donee," and an *inter vivos* gift "must be fully consummated during the lifetime of the donor and must invest ownership in the donee beyond the power of recall by the donor." *Casey*, 306 Mich App at 263 (quotation marks and citation omitted).

Our Supreme Court has explained that while "an actual delivery is indispensable to effect a parol gift . . . [s]ubsequent possession by the donor is not necessarily incompatible with the donee's dominion over the property; nor is it conclusive evidence that there was no delivery, or that the dominion did not pass to the donee." *Garrison v Union Trust Co*, 164 Mich 345, 348-349; 129 NW 691 (1911) (quotation marks and citation omitted). Thus, subsequent possession of a gift by the donor of the gift "would undoubtedly call for an explanation where the custody of the thing given had been retained by the donor, and such fact might be taken into consideration in determining whether a valid gift had been consummated, but it would not necessarily raise a conclusive presumption." *Id*. at 349.

In this case, plaintiff testified that Chakmak gave him the Rolex watch while Chakmak was alive, having told plaintiff during his "whole life" that the watch was "going to be [his] one day," and having "reinforced that through [their] relationship up until . . . he died." Plaintiff admitted that Chakmak wore his watch at the hospital before he passed away, and that Chakmak did not generally let him wear the watch during his lifetime, except for having let him wear the watch when Chakmak had a heart attack while plaintiff was in high school. Chakmak gave the watch to the hospital "to hold" before he passed away, after which plaintiff took the watch and the other items to his home, but discovered that the watch was missing a couple of weeks later. Joan later admitted that she took the watch, explaining that Chakmak wanted to give it to a different family member.

Plaintiff testified that Chakmak also gave him a set of Snap-on tools and a toolbox before Chakmak passed away. Plaintiff elaborated that from the time he was young, he and Chakmak would use the tools while working on items such as a lawnmower or car. Plaintiff described the tools as of professional quality, and stated that after 50 years of acquiring the tools, Chakmak had an extensive collection. According to plaintiff, Chakmak always said the tools would belong to plaintiff. Plaintiff explained that, throughout his whole life, Chakmak told plaintiff "you're going to get mine so don't go buy a brand[-]new set," and to "borrow mine while you're doing a specific project" because purchasing another set would "be a waste of money."

Plaintiff testified that after Chakmak passed away, he thought it convenient to keep the tools at Joan's home until she passed away since he was working on the house. Plaintiff stated that he would borrow a tool if he needed it, that he removed three of the tools in that fashion since Chakmak's death and did not know if he ever returned them to Joan's home. Plaintiff further explained that did not know what became of all of the tools, but had obtained some from another family member.

The trial court found that there was no evidence offered at trial showing that Chakmak made a fully executed gift of the watch and tools to plaintiff before Chakmak passed away. It explained that plaintiff's testimony showed at most, an intention on the part of Chakmak that plaintiff should receive those items after Chakmak's death. The trial court also noted that there was no evidence that Chakmak took any steps to effectuate his intent by either making a completed

gift of the items to plaintiff or "by providing in writing, consistent with the clause in his will that says so, that [plaintiff] should receive the items after his death."

Plaintiff argues that the trial court based its ruling that Chakmak never gave the watch and the tools to him on his not having retained possession of the watch and tools while Chakmak was alive, and points out that our Supreme Court in *Garrison* held that the subsequent possession of a gift by its donor did not create a presumption that no gift had been completed. See *Garrison*, 164 Mich at 348-349. However, there is no indication in the record that the trial court presumed anything from Chakmak's possession of the watch and tools at the time of his death, but instead simply observed that Chakmak retained "possession and control" of the watch and tools during his lifetime. And plaintiff points to no evidence in the record suggesting that he actually exercised control over the Rolex or the tools during Chakmak's life in the sense of enjoying possession not subject to Chakmak's right of recall. Because Chakmak maintained both possession and control of the watch and the tools, and there was no evidence that Chakmak actually completed a gift to plaintiff of those items before his death, or otherwise effectuated an intent to give those items to plaintiff in writing in accordance with the terms of his will, the trial court did not clearly err in concluding that plaintiff had failed to sustain his burden of showing that Chakmak had effected completed gifts of those items to him.[2]

Plaintiff additionally argues that the trial court erred when it rejected plaintiff's evidence regarding the value of the Rolex watch and tools for purposes of calculating a remedy for his being deprived of those gifts. Because we affirm the trial court's determination that no such completed gifts ever came about, we need not address arguments concerning the values of those items.

On cross-appeal, defendant argues that the trial court erred when it failed to rule on a request for sanctions against plaintiff, and asks this Court to award it sanctions from plaintiff covering the costs of defending frivolous litigation at trial and on appeal. We disagree.

After the close of evidence, the trial court permitted the parties to submit briefs before it delivered its ruling. Within the prayer for relief in Joan's brief, which was styled as proposed Findings of Fact and Conclusions of Law, Joan requested that the trial court "characterize [p]laintiff's claim as frivolous" because of "the complete lack of evidence adduced by" plaintiff during trial, and therefore award her reimbursement "for the costs of preparation and trial in this matter." Apparently, Joan did not otherwise request an award of sanctions for frivolous litigation. After the trial court delivered its findings and conclusions from the bench, the court asked the parties, "So, that, I believe, if I covered everything . . . is my decision," followed by "Okay?"

---

[2] Plaintiff argues in a footnote that the trial court erred by placing too little weight on Joan's deposition testimony, which was admitted in lieu of Joan's appearing as a witness. However, the trial court explained that from its review of the transcript of Joan's deposition testimony that the "elderly" Joan was "at least moderately confused much of the time during her deposition," and that Joan provided an "agreeable yet equivocal response" regarding Chakmak's giving the tools to plaintiff. The court thus adequately explained why it attached little significance to Joan's representations in that situation.

Defense counsel replied, "Thank you, Your Honor." The trial court thus did not rule on Joan's request for sanctions.

Under Michigan law, a party that maintains a frivolous suit or asserts frivolous defenses is subject to sanctions under applicable statutes and court rules. Under MCL 600.2591:

> (1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.
>
> * * *
>
> (3) As used in this section:
>
> (a) " Frivolous" means that at least 1 of the following conditions is met:
>
> (i) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.
>
> (ii) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.
>
> (iii) The party's legal position was devoid of arguable legal merit.

MCR 2.625(A)(2) provides, "[i]n an action filed on or after October 1, 1986, if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591." The trial court's finding regarding the frivolousness of an action is reviewed for clear error, but the amount of sanctions awarded is reviewed for an abuse of discretion. *In re Attorney Fees & Costs*, 233 Mich App 694, 701, 704; 593 NW2d 589 (1999). Additionally, a trial court's failure to exercise its discretion, when properly asked to do so, is itself an abuse of discretion. See *Rieth v Keeler*, 230 Mich App 346, 348; 583 NW2d 552 (1998).

In this case, the trial court did not abuse its discretion by declining to treat Joan's request in her final trial brief for a finding of frivolousness and an attendant award of compensation as a proper motion. See e.g., *Amberg v City of Dearborn*, 497 Mich 28, 35; 859 NW2d 674 (2014) (remanding the case for reasons including, "on a proper motion, a determination whether plaintiff is entitled to reasonable attorney fees, costs, and disbursements" where the plaintiff had requested fees and costs in his complaint and briefs). Further, Joan abandoned that avenue of advocacy at the hearing that followed, having said nothing about it even after the trial court asked if there was anything yet to address. Additionally, there is no indication that Joan's counsel asked the court to consider any such outstanding request after it entered its order dismissing plaintiff's claims. On this record, the trial court did not abuse its discretion for having declined sua sponte to revive, develop, and resolve Joan's request for sanctions predicated on plaintiff's frivolous litigation. There was thus properly no decision below for this Court to review. "Appellate review is limited to issues actually decided by the trial court." *Allen v Keating*, 205 Mich App 560, 564; 517 NW2d 830 (1994).

In attempting to revive the issue on appeal, defendant claims an entitlement to sanctions for frivolousness without specifying whether it is asking this Court to remand this case to the trial court for appropriate determinations, or to decide the matter in the first instance. Similarly, defendant, in framing the question presented for this issue, claims an entitlement to recover the costs of defending this action at trial and on appeal without acknowledging that any differentiation may be in order.

To the extent that defendant is asking this Court to impose sanctions covering its appellate expenses, defendant repeats the mistake of failing properly to raise the issue. Under MCR 7.216(C)(1), this Court may, "on its own initiative or on the motion of any party filed under MCR 7.211(C)(8), assess actual and punitive damages or take other disciplinary action when it determines that an appeal or any of the proceedings in an appeal was vexatious . . . ." Where a party is seeking "damages or other disciplinary action" under MCR 7.216(C), however, the party must proceed by way of a motion, and "[a] request that is contained in any other pleading, including a brief . . . , will not constitute a motion under this rule." MCR 7.211(C)(8). Because defendant has requested appellate fees and costs only by way of a passing reference to appellate proceedings in its brief on appeal, defendant has failed to place the question properly before this Court. For these reasons, we reject defendant's arguments on those procedural grounds. However, we also find that defendant's assertion that plaintiff's litigation was frivolous is without merit.

Defendant asserts that plaintiff's claims were frivolous because plaintiff supported them with only what defendant characterizes as self-serving testimony that had no objective or credible factual basis. While the trial court found plaintiff's evidence unpersuasive, plaintiff's claims were nonetheless not wholly lacking in evidentiary support. The trial court spent a great deal of time explaining precisely why it did not find plaintiff's evidence to be reliable or persuasive, which militates against defendant's suggestion that plaintiff effectively presented no evidence in support of his claims. "Not every error in legal analysis constitutes a frivolous position." *Kitchen v Kitchen*, 465 Mich 654, 663; 641 NW2d 245 (2002). Therefore, defendant's argument in support of its request for sanctions fails on the merits.

Affirmed.


/s/ Jonathan Tukel
/s/ Deborah A. Servitto
/s/ Jane M. Beckering