24-2104(L)
*SEC v. Core Business One*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of November, two thousand twenty-five.

Present:

> GERARD E. LYNCH,
> WILLIAM J. NARDINI,
> STEVEN J. MENASHI,
> *Circuit Judges*.

---

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

CORE BUSINESS ONE, INC., ROBERT S. OPPENHEIMER,

*Defendants-Appellants,*

MONEYLINE BROKERS, BASTILLE ADVISORS, INC., CLUB CONSULTANTS, INC., JUROJIN, INC., SANDIAS AZUCADARAS CR, S.A., VANILLA SKY, S.A., ROGER G. COLEMAN, ROBIN M. RUSHING, DAVID K. RUSHING, MICHAEL J. RANDLES, WARRIOR GIRL CORP.,CARL H. KRUSE SR., CARL H.

24-2104(L), 24-2105 (Con)

KRUSE, JR., AKA CARL KRUSE-VELASQUEZ, ALLAN M. MIGDALL, FRANK J. ZANGARA, MARK S. DRESNER, RICHARD S. ROON, FRY CANYON CORPORATION, L.F. TECHNOLOGY GROUP LLC, STARBURST INNOVATIONS LLC, TACHION PROJECTS, INC., BHI GROUP, INC., U D F CONSULTING, INC., DIGITAL EDGE MARKETING LLC, SPECTRUM RESEARCH GROUP INC., OCEANIC CONSULTING LLC, AKAT GLOBAL LLC, CHARLES S. MOELLER, "CHUCK", ANTONIO J. KATZ, "TONY" OR "ANTHONY", NATURE'S PEAK, FORMERLY KNOWN AS EVEROCK INC., ANNE M. HISKY, "ANNE", HAROLD BAILEY GALLISON, "B.J." AKA BART WILLIAMS,

*Defendants.\**

| | |
|---|---|
| For Plaintiff-Appellee: | STEPHEN SILVERMAN, Appellate Counsel (Jeffrey B. Finnell, Acting General Counsel, Tracey A. Hardin, Solicitor, Jeffrey A. Berger, Assistant General Counsel, Rachel M. McKenzie, Senior Appellate Counsel, *on the brief*), Securities and Exchange Commission, Washington, DC |
| For Defendants-Appellants: | CHRISTOPHER P. MILAZZO, Sichenzia Ross Ference Carmel LLP, New York, NY |

Appeal from judgments of the United States District Court for the Southern District of New York (George B. Daniels, *District Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED.**

Defendants-Appellants Robert S. Oppenheimer and Core Business One, Inc. ("CBO"), appeal from judgments entered on July 9, 2024, in the United States District Court for the Southern

---

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

District of New York (George B. Daniels, *District Judge*), in this enforcement action brought by the Securities and Exchange Commission ("SEC") in connection with public offerings of unregistered shares of stock of Everock, Inc., and a "pump-and-dump" scheme involving the same stock. Oppenheimer was the CEO and sole employee of CBO, through which he acted as a business consultant to Nature's Peak, Inc.

Nature's Peak was a privately held business that produced and sold vegetable dips and sandwich spreads. Oppenheimer began providing business advice to Nature's Peak in 2003. In 2007, in light of Nature's Peak's dwindling financial prospects, its owner, Paul Wilkinson, asked Oppenheimer for advice on how to raise money for the business. Oppenheimer introduced Wilkinson to an acquaintance, who in turn introduced Wilkinson to Frank Zangara and Mark Dresner. In or around 2008, the acquaintance and Zangara recommended that Wilkinson take Nature's Peak public via a reverse merger with Everock, a public shell company controlled by Zangara. Wilkinson, after discussing the idea with Oppenheimer, agreed to do so.

The reverse merger was consummated in August 2008. Prior to the merger, Everock's then-president and CEO Charles Moeller issued 300 million restricted shares of Everock common stock to himself. Restricted stock—generally stock acquired in an unregistered offering, including in a private offering—cannot be sold unless the subsequent sale is registered or exempt from the registration requirements. Nevertheless, after the merger was consummated and Moeller resigned, the restricted shares were transferred to entities controlled by Zangara. Zangara then sold those shares to the public amidst concerted efforts by Defendants-Appellants to "pump" the stock, including by issuing press releases timed to coincide with efforts by stock promoters. Between September 2009 and September 2010, the Zangara-controlled entities sold shares of Everock to the public for approximately $2.4 million.

3

The SEC sued Oppenheimer, CBO, and various co-defendants on July 14, 2015, for violations of the securities laws. Zangara, Dresner, and Moeller each consented to the entry of final judgment against them.

The district court granted the SEC's motion for summary judgment as to Oppenheimer and CBO, determining that they were liable for the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e. The district court also held Oppenheimer liable for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2). Following a hearing before a magistrate judge and the resultant report and recommendation, the district court imposed Tier III civil penalties of $150,000 on Oppenheimer and $725,000 on CBO. The district court also ordered $480,000 in disgorgement from Oppenheimer and CBO, jointly and severally, and $300,859.59 in prejudgment interest.

On appeal, Defendants-Appellants argue that factual issues preclude the district court's grant of summary judgment; that the civil penalties are time-barred or, alternatively, that the facts do not warrant Tier III penalties; and that the district court erroneously failed to reduce the amount of disgorgement by Oppenheimer's purported business expenses. We assume the parties' familiarity with the case.

## I.    Summary Judgment

"We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *McCutcheon v. Colgate-Palmolive Co.*, 62

F.4th 674, 686 (2d Cir. 2023).[1]   Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).

**A. Section 5 Claims**

Sections 5(a) and 5(c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell" or "offer to sell" a security unless a registration statement is in effect or has been filed.   15 U.S.C. § 77e(a), (c).   Section 5 is a strict liability statute that does not require a showing of scienter or negligence.   *See SEC v. Cavanagh*, No. 98-cv-1818, 2004 WL 1594818, at *16-17 (S.D.N.Y. July 16, 2004), *aff'd*, 445 F.3d 105 (2d Cir. 2006).   The elements of a violation of Section 5 are "(1) lack of a required registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."   *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016).   "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she engaged in steps necessary to the distribution of unregistered security issues."   *Id*. (citing *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)).

Defendants-Appellants do not dispute that the sale of Everock stock to the public violated Section 5.   Instead, they insist that they were not "necessary participants" in the sale of the unregistered securities—or at least that there are "questions of fact" as to whether they were. Appellants' Br. at 16.   "The necessary participant inquiry assesses whether, but for the defendant[s'] participation, the sale transaction would not have taken place—in other words, whether the defendants' acts were a substantial factor in the sale transactions."   *SEC v. Sason*, 433

---

[1] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

F. Supp. 3d 496, 513 (S.D.N.Y. 2020); *see also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (quoting *SEC v. Murphy*, 626 F.2d 633, 651–52 (9th Cir. 1980), for the same proposition); *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1046 (2d Cir. 1976) (rejecting the argument that there should be no aiding and abetting liability under Section 5 because "[b]y its terms, Section 5 makes it unlawful, directly or indirectly, to sell unregistered stock"); *Chinese Consol. Benevolent Ass'n*, 120 F.2d at 741 (explaining that Section 5(a)(1) "broadly prohibits sales of securities irrespective of the character of the person making them" and that a statutory exemption in Section 4(a)(1), *see* 15 U.S.C. § 77d(a)(1), "does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of security issues"). "[O]ne who plans a scheme, or, at the least, is a substantial motivating factor behind it, will be held liable as a seller." *SEC v. Genovese*, No. 17-cv-5821, 2021 WL 1164654, at *3 (S.D.N.Y. Mar. 26, 2021).

According to Defendants-Appellants, the district court erred by refusing to credit Oppenheimer's assertion (as expressed in a declaration submitted at summary judgment and deposition testimony) that he was an unwitting participant in the scheme and instead crediting the testimony of Wilkinson and Moeller as to Oppenheimer's central role in the scheme, thereby going "beyond its proper role on a motion for summary judgment" by "weighing evidence and making credibility determinations." Appellants' Br. at 19–20.

These arguments fail. First, the record reveals that Oppenheimer was a necessary participant in the sale of unregistered Everock securities. He reviewed, forwarded, and commented on merger-related documents. Following the merger, he was named secretary of Everock and appointed to its board of directors. He requested a ticker symbol to facilitate the trade of Everock stock, and he does not dispute that he reviewed and approved drafts of Nature's

6

Peak's financial disclosures necessary to list Everock stock. Beginning in August 2009, Oppenheimer solicited formal opinion letters from Everock's counsel for Everock's transfer agent to facilitate the removal of trading restrictions on Moeller's shares, based on his "understanding [] pursuant to the rules" of the SEC. Joint App'x at 593–94. Armed with the opinion letters, Moeller instructed the transfer agent to transfer the shares to accounts controlled by Zangara beginning in August 2009—and Oppenheimer did so himself between March and July of 2010. Then, Oppenheimer facilitated the transmittal of more opinion letters to Zangara's broker dealer, which required the letters to receive the unregistered securities. Oppenheimer also promoted Everock stock by drafting press releases and a script for a promotional video. Taken together, Oppenheimer's conduct was necessary to further the sale of unregistered securities. *See, e.g.*, *SEC v. Sourlis*, 851 F.3d 139, 144–45 (2d Cir. 2016).

Oppenheimer does not dispute that he engaged in this conduct. Instead, he argues that the district court impermissibly concluded that he played a central role in the scheme based solely on testimony from Wilkinson and Moeller. However, the district court relied on Oppenheimer's own admissions and on record evidence illustrating Oppenheimer's central role in the scheme, not only the testimony of his co-defendants. The district court cited the testimony of Wilkinson and Moeller to support conclusions that the record evidence otherwise established. That evidence uniformly painted Oppenheimer as intimately involved in the scheme, and it required any rational jury to find Oppenheimer liable even absent his co-defendants' testimony. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Oppenheimer's further argument that he was not necessary to the scheme merely because

7

he lacked "legal or corporate expertise" and "was merely acting in a ministerial role" is unsupported, contradicts record evidence, and, more importantly, is beside the point. Appellants' Br. at 19–20. Oppenheimer cites no case for the proposition that (indisputably) engaging in the aforementioned acts in a "ministerial" manner shields him from liability, and the plain language of Section 5—which is a *strict liability* statute—does not insulate those who sell unregistered securities, even without knowledge of illegality, from liability.[2]

We therefore conclude that no reasonable juror could have found that Defendants-Appellants were not necessary participants in the sale of unregistered securities.

## B. Securities Fraud Claims

Section 10(b) of the Exchange Act and Rule 10b-5 "prohibit fraud in the purchase or sale of a security." *Frohling*, 851 F.3d at 136. A person commits securities fraud if he "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Id*. Section 17(a) of the Securities Act prohibits fraud in the "offer or sale" of a security. 15 U.S.C. § 77q(a). The elements of a claim under Section 17(a) are "essentially the same" as those under Section 10(b) and Rule 10b-5. *Frohling*, 851 F.3d at 136. Section 17(a), however, requires negligence rather than scienter. *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

A false statement is "made with the requisite scienter if it was made with the intent to deceive, manipulate, or defraud." *Frohling*, 851 F.3d at 136. "Scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable

---

[2] Oppenheimer's "ministerial" argument could be understood to suggest that his actions were *de minimis*. *See SEC v. N. Am. Rsch. & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) (noting that "de minimis" participation is insufficient for liability under Section 5). For the reasons already discussed, that argument would also fail.

and which represents an extreme departure from the standards of ordinary care." *Id.*

The SEC's claims against Oppenheimer rely primarily on two statements. First, on October 3, 2009, Everock submitted an Annual Update Disclosure Statement (AUDS) to the over-the-counter trading platform that lists penny stocks such as Everock. The AUDS—which Oppenheimer concedes he edited, reviewed, and signed—stated that Moeller had "effectively returned" 270 million of his 300 million shares to Everock. Joint App'x at 159–60, 1551. Second, on December 14, 2009, Everock issued a press release Oppenheimer drafted stating that "it has received more than $200,000.00 from Core Business One towards its current finance round" and quoting Oppenheimer as saying that "I am pleased to be able to facilitate capital necessary to support Nature's Peak['s] immediate cash requirements and move us forward to having production scheduled." Joint App'x at 235.

Oppenheimer does not dispute that both statements were false when made. But he argues that the district court erred in holding that the record compels the conclusion that he *knew* that both statements were false when made and therefore had scienter. Oppenheimer does not address whether he was negligent with regard to the false statements, as required under Section 17(a), thereby waiving any argument that summary judgment on that claim was inappropriate.

Turning to the Section 10(b) and Rule 10b-5 claim, we agree with the district court that no reasonable juror could find that Oppenheimer lacked scienter. At the time the AUDS was published, Oppenheimer had recently furnished Everock's transfer agent with an opinion letter, which allowed the removal of trading restrictions on 70 million of Moeller's shares and the transfer of the shares to brokerage accounts controlled by Zangara. That transfer was completed a mere two months before Oppenheimer's statement in the AUDS. After the transfer of the 70 million shares, Moeller would have been left with 230 million shares, so it was impossible for him to have

9

270 million shares to return to Everock. The record indicates that Oppenheimer knew the October 3, 2009 statement was false, particularly because he would again facilitate a transfer from March to July 2010 and provide equivalent assurances to the recipient broker-dealer. Thus, no reasonable juror could find that Oppenheimer believed that Moeller's shares—which were crucial to the "dump" element of the scheme—had been returned to Everock as of October 3, 2009.

Oppenheimer admitted at his deposition that the December 14, 2009 press release—which he drafted—was false because the $200,000 referenced in the release came from Digital Edge Marketing LLC (Dresner's company) rather than CBO. Oppenheimer notes that he *also* said during his deposition that he has a "different standard of looking at things from . . . now versus then and what I was informed of and what I didn't know then and what I know now." Joint App'x at 210. This vague statement does not undermine the conclusion of the district court that Oppenheimer admitted that he knew the statement was false when made or his counsel's concession of the same during oral argument before the district court in this case. Oppenheimer does not, for example, identify record evidence showing that he reasonably could have believed that the financing came from CBO.

We conclude that no reasonable juror could have found that Oppenheimer lacked scienter.

## II. Civil Penalties

The district court imposed Tier III civil penalties—the statutory maximum—on Oppenheimer and CBO for the Section 5 violations. Defendants-Appellants argue that the penalties are time-barred under 28 U.S.C. § 2462, and alternatively that their conduct does not warrant Tier III penalties, primarily for the same reasons they contend the penalties are time-barred. Both arguments are forfeited because Defendants-Appellants did not make them in the district court. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 662 (2d Cir.

10

2015).  Defendants-Appellants contend that the first illegal sale of unregistered Everock stock, and Oppenheimer's most important actions in furthering such sales, took place more than five years before the SEC brought this action, and that the imposition of civil penalties was thus prohibited by the statute of limitations.  But the evidence shows that the sales continued, and Oppenheimer continued to have some involvement in the scheme, into the limitations period.  Because Defendants-Appellants cite no binding authority holding that the statute of limitations precludes civil penalties under these circumstances, any asserted error by the district court in imposing such penalties cannot be plain. We decline to consider Defendants-Appellants' statute of limitations arguments for the first time on appeal.

## III.  Disgorgement

District courts may impose a disgorgement remedy on defendants found to have violated the securities laws.  "[I]n order to establish a proper disgorgement amount, the party seeking disgorgement must distinguish between the legally and illegally derived profits, so that disgorgement is ordered only with respect to those that were illegally derived."  *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).  "Nonetheless, because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds[,] . . . the court need not determine the amount of such gains with exactitude."  *Id*. Instead, "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation."  *Id*.  "So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998).  "Once the SEC has met [its] burden of establishing a reasonable approximation of profits causally related to the fraud, the burden shifts to the defendant" to prove that the district court's measure is inaccurate.  *Razmilovic*, 738 F.3d at

11

31–32.

Here, an SEC forensic accountant calculated Defendants-Appellants' unjust gains as $480,000 by adding together transfers to CBO's bank account from other co-defendants in this case. Defendants-Appellants argue primarily that this amount should be offset by business expenses purportedly recorded in a spreadsheet that Oppenheimer drafted. The magistrate judge found, and the district judge affirmed, that the homemade spreadsheet, which lacked any supporting documentation and included, *inter alia*, hundreds of thousands of dollars in estimated travel expenses, did not constitute reliable evidence sufficient to undermine the SEC's approximation of Defendants-Appellants' unjust gains. Because it was Defendants-Appellants' burden to demonstrate that there were "legitimate" business expenses that should have been deducted, and they failed to carry that burden, the district court did not abuse its discretion when it rejected Defendants-Appellants' challenge to the disgorgement calculation. *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021).

\*      \*      \*

We have considered Defendants-Appellants' remaining arguments and find them unpersuasive. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

12